The United States Board of Appeals for the Federal Circuit is now open and in session. God save the United States and this federal court. Thank you, please be seated. Our case for argument today is 25-1812. V.O.S. Selections v. Trump. Mr. Shoemake, please proceed. Chief Judge Moore and may it please the court, Brett Shoemake from the Department of Justice on behalf of the federal government. Congress has long given the president broad discretion to deal with complex and evolving national emergencies in light of his preeminent role in foreign affairs and national security. For decades, IEPA has been one of the most powerful tools that any president can use to protect our national security, our foreign policy, and our economy. To combat emergencies involving the flood of illegal drugs into the United States and the consequences of our exploding trade deficit, the president imposed tariffs under IEPA to put pressure on other countries to address the underlying problem. But IEPA has rarely been used since then. No, you're right. IEPA has been over 50 years or so since it's been used. Since 1977, it's often used by the president and the Treasury Department, for example, for OFAC sanctions and all kinds of license restrictions and transfers. The government uses IEPA all the time. IEPA, to be sure, has not been used for tariffs, but IEPA was enacted in 1977, two years after. That's what we're concerned with here. When's the first time that IEPA was used for tariffs? This is the first time IEPA has been used for tariffs. But the statute's been in existence for over 50 years, correct? Correct, but the statute here incorporates the exact same language. Why is it? Has there been no national emergencies in it in the 50 years? There have been other national emergencies. There have been many national emergencies, but this is the first time IEPA has been used to address these types of emergencies. But I think the critical point is that IEPA incorporates the exact same language from the Trading with the Enemy Act that President Nixon used in 1971 to impose tariffs. And this court's predecessor in the Yoshida case in 1975 held that that language authorized tariffs. And I think that's an important decision, but I think the critical feature with Yoshida is that Congress was legislating against the backdrop of Yoshida in 1977 when it incorporated the exact same language. And we know that Congress was aware of that decision. It was referenced in the House report. So at a minimum, Congress was aware of Yoshida, understood that by incorporating that exact same language, it would be authorizing the President to use IEPA to impose tariffs. What is your argument just on the statutory language of 1702, putting aside Yoshida, that that language would properly impose tariffs as one of the tools? So the phrase is regulate importation among nine specific actions that the President can take, starting with investigate all the way to prohibit or prevent. The phrase here that the President relied on is regulate importation. Tariffs regulate importation by controlling imports, by adjusting imports. The language here is similar to the language in Section 232C, which says adjust imports. And that language has always been understood to authorize, since Algonquin, to authorize license fees. And this court has upheld 232 tariffs using the language adjust imports. A tariff is similar to a license fee. It's a condition on import. But I think the other side says, or they will say, that one of the reasons that it's not applicable is because Algonquin dealt with 232 references specifically duties. And that's not the case with IEPA. So 232 does reference duties in another portion of the statute. But the language that the Supreme Court was interpreting in Algonquin was Section 232C, which has the phrase adjust imports. And the Supreme Court said adjust imports authorizes more than just quotas. It authorizes license fees. You can think of a tariff as a license. It's a condition on importing the product or the goods. But let's come back to the language of IEPA. Is it your contention that regulate carries with it its plain moral meaning to always include tariffs for taxing? And that when it's used throughout the United States code, and I think you acknowledge it's used in a lot of ways in a lot of statutes that we wouldn't think are authorizing tariffs, that there's some other language in those statutes that tells us that regulate isn't carrying its full plain moral meaning? Is the plain moral meaning of regulate including the power to tax the tariff? No, I think the word regulate takes its meaning from context, right? So FDA, when they're authorized to regulate drugs, they're not authorized in that situation to impose tariffs. But here, IEPA says not just regulate, but regulate importation. Counsel, when we look at the statute in which regulate appears, we see foreign exchange, payments, currency, and there's an old expression in the law, you know it by its friends. Tariffs seems to have no friends in that statute. So why would we read tariffs in that statute? Well, your honor, I think you're referencing the language in 1702A1, right? That's not the language that the president relied on. He relied on 1702A1B, which has a string of a number of actions, starting with investigate, going all the way to prevent or prohibit. And so I think it's undisputed that IEPA would clearly provide the president with the authority to prohibit all imports. Say, we're not going to allow any imports into the United States from China, right? That is an extraordinary power, and that is a power that IEPA expressly authorizes the president to take. And so the authority that the president invoked here is the power to regulate importation. But that isn't what he's done. He hasn't blocked the means of imposed tariffs. Right. He has. And we know that Congress was aware of the Yeshiva decision in 1977 when it adopted IEPA, and would have understood that by using this exact same phrase, regulate importation, Congress would have intended to authorize the president to take the exact same action that President Nixon took in 1971. I know that's your problem, it seems to me, because the action that President Nixon took that was included in Yeshiva was much narrower than the action that's involved here. And you in your brief say, and you've said it this morning, that when Congress is aware of the decision, as it was with Yeshiva, that the construction that was given is read into the statute. But the construction that was given is not a broad construction that permits upending the entire tariff schedule, which is the power that's claimed here. And the Customs Court in Yeshiva expressed concern that that's exactly where the government's argument led. And the Court of Customs and Patent Appeals said, no, no, we're not saying that that's the breadth of the statute. In fact, it's not the breadth of the statute. So how do you deal with the fact that Yeshiva itself seems to give a narrower construction to the statute than you're giving to it now? Well, I think Yeshiva was interpreting a specific statute, the Trading with the Enemy Act. But the core holding of that decision, Yeshiva 2, was that the phrase regulate importation authorizes tariffs, right? But not all tariffs. But not all tariffs. They seem to be pretty clear about that. But if you agree with me that the phrase regulate importation authorizes at least some tariffs, then we have to look to IEPA, the statute the President relied on, and decide, did the President contravene any expressed limits in the statute? And he did not, right? So Section 1702A2. Can I just bring you back to that point, which is important? I just want to get back. I think I understand your point about why this statute regulates to imposing a monetary penalty to reduce the amount. At least most, maybe even all, of the other statutes that the parties have cited, the enemies that are regulated, are not about controlling amounts of things. So the context is quite different. But what about this? The statute says prevent or prohibit. Sometimes might it not be the case that Congress wants to give the democracy a tough choice between really tough action and no action, because intermediate kinds of actions, and here I think Eric would see such a thing, are too easy. And why wouldn't that be something to take account of here? I think it's important to understand the context in which Congress enacted IEPA. It is a broad emergency statute. The nine actions that Congress outlined in Section 1702AB1 are extraordinary, right? They provide a number of overlapping authorities, and they authorize the President to take extraordinary action in the context of an emergency, similar to what President Carter did during the Iran hostage crisis. He imposed asset transfers to put pressure on Iran at that time. And so Congress wanted to provide broad and flexible authority in the context of emergencies, and I think you have to read the phrase regulate importation in the context of an extraordinary delegation of power to the President. That can be checked by Congress in specific cases. But that's not very realistic, because in order for Congress to act, the President would have to sign the legislation, and if the President claims the authority, it's not likely to cabinet his own authority by signing legislation, and it's almost impossible to override a presidential veto. I disagree, Your Honor. Just a few years ago, Congress terminated the COVID emergency. There were 68 votes in the Senate to terminate that emergency. So there are a lot of longstanding emergencies, but Congress can act, and the way the statute is written, there's Section 1703, 1706, and the Emergencies Act itself. It provides for extensive procedures for Congress to be involved in this process. Counsel, would your argument be that at the time when Congress adopted this quite broad delegation of authority to the President, it was operating under the possibly then mistaken view, but the view nonetheless that they had concurrent power to override without a presidential veto, which is why they weren't worried about bestowing the broad power. It turns out they were wrong, but that doesn't affect the broad bestowing of power. Correct. It doesn't affect the broad delegation of power. I think you're referencing Chadha, right? So when a veto is enacted, one house, Congress itself could terminate a declaration of national emergency and suspend the President's power after Chadha. That was no longer the case, but the statutes have been amended after the fact.  But just the National Emergency Act is different, right? Correct. But if Congress terminates a national emergency, it will terminate the President's ability to invoke AIPA because AIPA depends on the national emergency. And have there been cases in the Chadha line that say when certain powers were granted subject to an unconstitutional legislative veto provision, the power fails? I don't know, Your Honor, but the statute has been amended to account for Chadha, and the process is still consultation with Congress, reports to Congress. Presumptively, the emergency only lasts one year, and Congress has a procedure to terminate national emergencies. All of that, I think, shows that there are checks on the President. If we can go back to the limits on the statute. Before you go there, Counselor, one of the major concerns that I have is that AIPA doesn't even mention the word terrorist anywhere. And when Congress rewrote the TWA and came up with AIPA, it certainly was aware about terrorists. Correct. I mean, you can see that they were. And the United States possesses a highly structured regulatory statutory framework for trade matters. And I have 10 listed here, and I won't go through the list, but they all mention the word terrorist in duties. And you would agree with me that those statutes do pertain to terrorists, and there's no doubt about that, correct? Correct. But here, AIPA doesn't even say terrorist. It doesn't even mention them. I don't think that's unusual. I think there's at least two statutes I can point you to that don't use the word terrorist. Section 232C says adjust imports. What do you mean it's not unusual? It's not unusual in the trade framework? Because it is very unusual in the trade framework. Excuse me. I just meant to say there are at least two examples of statutes that authorize terrorists that don't use the word terrorist. Section 232C and 122, which authorizes the president to restrict imports. But are both of those in a part of the code that deals expressly with customs and duties, unlike AIPA, which is not in that chapter? It is. And I think Yoshida has directly addressed this point, where a similar argument was made in that case to the argument made in this case, that yes, there are a bunch of many specific tariff authorities, and those tariff authorities should govern over a specific emergency authority. Yoshida said at page 578, quote, There was an issue when Yoshida was deciding, correct? He mentioned the word terrorist. He was just including that. Why is it that when Congress wrote the AIPA and borrowed almost all the language it did from the TWA, why did it not recognize Yoshida in a way to include, to even mention the word terrorist for duties? I think it didn't need to specifically use the word terrorist because it was writing that law two years after Yoshida had recognized that the phrase, regulate importation, authorize terrorists. But your problem is that Yoshida didn't speak that broadly. The customs court there said government's construction allows a wholesale rewriting of the tariff section. And Yoshida said, no, that's not true. It's capped. It doesn't give that broad authority. And why is it that when Congress adopted AIPA, it didn't write against the construction that was given by the statute in Yoshida, which authorizes terrorists but also is a limiting construction? Why do we accept part of the construction but not the other part of the construction? You can take the whole holding of Yoshida, but I think you have to look to AIPA itself for the limits on the tariff. Sounds like we all agree the phrase, regulate importation, authorizes at least some terrorists. So then the question is, what are the limits on the president's tariff authority? Those limits have to come from AIPA itself. And the statute has not. But here's the problem. If you're saying, I mean, I don't think you're responding to our second question. We want to use Yoshida to say that regulate as a term can include terrorists. But to do that, you have to, and let me preface by saying, I don't think, hypothetically, I don't think regulation in this context naturally would include terrorists. So I have to get there through some other way. And the way is ratification of Yoshida by Congress. But if we assume that Congress intended to ratify Yoshida, don't we have to assume that it intended to ratify its entire holding, which is that regulate doesn't mean unbounded authority to impose tariffs. It means bounded tariff authority within the confines of what is described there. And there was very specific facts about how some of these tariffs would not go without, I think, federal too. We wrote, Congress is incorporating all of that, not just the definition regulate, but that regulate in this context means the power to impose a limited tariff within this framework. Then does this executive order comply with that limited framework in Yoshida? Yes, it does, because you have to find some law that the president violated to strike down the tariffs. On that hypothetical. Does it exceed the definition of regulate as adopted by Congress from Yoshida? It's not just regulate equals tariffs. Regulate equals tariffs that are within the statutory framework already enacted by Congress. And I don't think those are true here, but at least some of them. Maybe some of them are, but some of them are not. But Congress enacted IEVA using the same language, right? I don't think you're going out of line. You are not going to answer my question. I'm trying to identify what the limits would be that would constrain. Yoshida, take that as the starting point. You accept that Yoshida itself, as a matter of reading that case, has limits on the authority to impose tariffs as part of regulate. And you read the case, and you see the context, which is President Nixon imposed some tariffs, slightly above, but my understanding of the court's opinion, and you can correct me if I'm wrong, but I don't think that the court specifically looked at them and said, because a lot of these there have been concessions before, none of the tariffs imposed went beyond the schedule that had already been enacted. And so that was the context in which they were allowing a presidential assertion of tariffs under IEVA within the already existing framework. They specifically said, we don't think regulate here means unvalued authority. And it seems to me you're asking for unvalued authority. Is that a problem? The president is not asking for unvalued authority, and I think you have to interpret it. Unvalued authority in terms of the unbalanced. Are you asking for unvalued authority in terms of the percentages? Well, there certainly is no cap. Is there a yes or no answer to unvalued authority in terms of yes or no? No, there's no limit on the cap of the tariff in IEVA itself. There are limits in IEVA. Do you not think Yoshida is suggesting that there should be a limit on the amount? No, no, no. I understand you don't agree with the way I'm looking at it, but I think Congress ratified Yoshida. I think it ratified all of it. It just, I mean, particularly because it said very, very little about Yoshida and Yoshida. It just noted it. It certainly didn't say, well, we agree to regulate mean terrorists. All we're doing is reliant on that payment of Congress's intent to enact, you know, when they reenact it, it tends to adopt a judicial precedent. I don't see any precedent in this senate where we can parse it and say the intent is not this part of the case but not this part of the case. I'm trying to answer the question. We take all of Yoshida, but the fact of the matter is the president didn't rely on the Trading with the Enemy Act. He relied on AIPA, AIPA against the backdrop of Yoshida, and AIPA itself has its own limits. Well, I just want to add in, because you talked about that same issue a little bit, that the legislative history says Yoshida was a bad king. Did you read that part of the legislative history? Are you aware of that part? Yes. Okay. And so it sounds like you're talking that Yoshida carried a lot of weight, but I think there are at least portions of that history that really do take issue with Yoshida, and if it's an issue, the other part is what we read about. Congress would have understood when it used the exact same phrase, regulated importation and AIPA, against the backdrop of Yoshida, that it would be authorizing tariff authority in the president, and I think the question is then what are the limits? Does this tariff authority, these actions— Talk about the limits you think are on AIPA. Why don't you talk about that? Sure. So 1702B identifies four specific limits on AIPA authority. For example, the president can't regulate— I think that has something to do with the scope and duration of the tariffs, and you're just discarding the holding of Yoshida that you don't like, and the customs court said the effect of what the president is claiming here is to allow wholesale rewriting of the tariff schedules, and the unappealing court said no, no, that's not true. That's not what it does, and now you're saying, oh yes, we can do a wholesale rewriting of the tariff schedules. We can tack on 10% to every tariff that Congress has provided there. That's a wholesale rewriting of the tariff schedule, and I just don't see how you read Yoshida as authorizing that. So Section 232 also doesn't have a cap on the tariff rate? No, you're not answering my question. How is it that you can read Yoshida as authorizing that kind of wholesale rewriting of the tariff schedule? Well, I think—so Yoshida 578 said, quote, the existence of limited authority under certain trade acts does not preclude the execution of other broader authority under a national emergency powers act, end quote. So what they were saying was, yes, there may be other tariff statutes that may also apply in the context of non-emergencies, but in the context of an emergency, the president can invoke that authority, and he can invoke all of it, subject to the limits in the emergency authority. At 583 in Yoshida, the court said, quote, the declaration of a national emergency is not a talisman enabling the president to rewrite the tariff schedules, and because that was the sound of death knell of the Constitution. So clearly, you know, I understand Yoshida is a critical part of your case, but as others have said, you have to buy all of Yoshida, and it seems pretty clear to me that Yoshida is telling us that, no, the president doesn't have the authority to rewrite the tariff schedule, and it seems like in this case, that's what the president is trying to do. Respectfully disagree, Your Honor. I think that the main point I can say in response is, yes, we can take all of Yoshida, but you have to interpret this statute and the limits on this statute, and is there any argument that the president violated or exceeded any limit in AIPA itself? There's not, because there are limits. Then the next question is, maybe there needed to be a limit in AIPA that is lacking, because it's standardless in terms of what kind of guidance Congress gave or should have given to the president in terms of figuring out how far it could go in terms of imposing these types of tariffs. I'm happy to talk about non-delegation. I'm sure we'll get there, but I think a dissatisfaction with the limits in AIPA itself is not a license for the court to impose its own limitations on the statute. Counsel, you haven't talked about Section 122. Yes. The Trade Act of 1974, and that has limits, time limits, and amount of the tariff, and it's a specific government general. Even if AIPA has some relevance to tariffs, 122 is more specific. In this area, Congress often enacts multiple overlapping statutes, and as I said earlier, when you should address this point, there may be other specific tariff authorities that the president couldn't... Yes, but we have this rule of interpretation in the law, the specific government general. We also have a canon that you're supposed to interpret statutes so they fit together and one doesn't supersede the other, and you can interpret 122 in AIPA to work together. This 122 says whenever, so whether it's an emergency or non-emergency, 122 is available. AIPA is only available in the context of an emergency. You wouldn't read 122 to limit AIPA any more than you would read AIPA to limit Section 122 with both of them. I'm going to do some refereeing up here. I think he was thrown two things, two different things maybe. One is whether or not it's unbonded, and the other is whether or not AIPA is limited to the limits that existed under Yoshida and the specific limitations in the statute. And I thought your answer that I gleaned in the briefs was that it's not unbonded or boundless because it requires a national emergency and extraordinary and unusual circumstances. And in that context, it seems like one could argue that Congress was acknowledging, and the House report reflects this, that we're giving broad authority because we're dealing in the unknown. We're dealing with something extraordinary that maybe was unforeseen that maybe never happened before, and that's why you wouldn't necessarily want to be limited to something that happened before 1977. That's correct. AIPA is an entirely different statute using the same phrase as before, but Congress intended to provide extraordinary power to the President in an emergency and has these checks in 1701. Counsel, if you agree with those limits, are those limits judicially reviewable? And if they're not, are they really limited? We agree the limits in Section 1702 are reviewable, whether this regulates importation. We disagree that 1701 is reviewable, whether there's an emergency, whether there's an extraordinary threat. If they're not reviewable, how are they limited? They're reviewable because the President himself is bound by law. Congress itself can review the Declaration of an Emergency and terminate that. The President has to report to Congress. Congress has terminated emergencies in the past. So the fact that there's no judicial review doesn't mean the President isn't bound by the law. Judge Hughes is next. Sorry. So let me go back to regulations. And let's just say the issue is outside entirely. I'm struggling with your answer because you seem to want part of it, not part of it. So let's just go on an AIPA without any background. So what we're looking at is a regulation in the context of this specific statute without any legislative discrepancy at all. It's just general stuff. Why would we assume that in this specific context that Congress would have intended to regulate to mean the power to tax? Regulation sometimes, but not only, means the power to tax. So we're relying only on the word regulate, but regulate any importation, which is similar to adjusting imports, restricting imports, as far back as Gibbons. The Supreme Court recognized the power to regulate commerce by imposition of duties. I think it's also... And Congress delegates its tariff authority, its power to tariff to the executive, and the question is whether AIPA is one of those statutes. Section 1702... You acknowledge that every time they use the word regulate, it doesn't include the power to tax. So where's the dividing line on this use of regulate to devalue the condition? It's regulated importation, and one of the ways, for centuries, countries have regulated importations by imposing a condition on the good and its access into the United States is by charging a fee. So you're using the term regulate imports. Congress intended to give up its long-standing power to tax imports to the executive, admittedly under emergency circumstances, but that's what we think. Yes, Congress has delegated a number of specific tariff authorities to the president. It's not surprising that Congress... Sure, but when they have, almost every one of them used the word tariffs for duty in some other statute. I don't think it should be surprising, though, that because this is an emergency statute, when Congress delegated the even more extraordinary power to block and prevent imports altogether, Congress would have also wanted to authorize the executive to also take the lesser measure of imposing a condition on import, which is essentially a license. And 1702A expressly authorizes license. Mr. Strain, I have a clarification question, just real quick. My first question is, what is the government's view on what the threat is? Is it the trade deficit? I mean, that's what your brief suggests. I think it depends on which emergency declaration we're talking about. So first of all, the president identified a number of underlying causes of contributing to the trade deficit, tariff barriers, a lack of reciprocity in our trading relationships, non-tariff barriers, all of which contributing to a spike in our trade deficit, which has reached a tipping point, and then the president identified the consequences of the trade deficit. So the consequences are... And then I have another question, just real quick. I don't see in the briefs where there was any attempt to distinguish between the various reciprocal or trafficking tariffs based on the varying amounts of those tariffs. Am I missing anything? You're not, because the plaintiffs don't challenge any of the rates, right? And they wouldn't have any basis to challenge the rates or ask the court to review the rates, because this court's precedent has been very clear, I think, that you don't review the president's rationale... Okay, counsel, but what about the deals with? So you wanted to articulate four limits, and I want to give you a minute, and I'm hoping everybody will let you just get quickly, get your four limits out before somebody interrupts you, because I think deals with is one of them, and I think that might provide us with the authority to have some very deferential review. Like, you know, if the president says there's a problem with our military readiness, and he puts a 20% tax on coffee, that doesn't seem to necessarily deal with unless he links it up somehow. You understand? So can you address that quickly for me? Sure. So our initial position is that 1701 is not reviewable at all. Yeah, but get past that. Even if it were reviewable, it would have to be extraordinarily deferential to the president. And sure, in an extraordinary case... Answer my question. So these tariffs deal with the emergencies by giving the president leverage in the same way that President Carter... So you think this is a bargaining chip, like James and Moore? Exactly. But even on the reciprocal tariffs, you think it's a bargaining chip? Yes, the president just negotiated trade deals with the European Union using the tariffs as leverage to negotiate trade deals that address the emergency that he identified. It's just like what President Carter did. But that would read deals without. No, it wouldn't. How is deals with still a meaningful limitation on presidential power? Because it gives the president leverage to address the emergency through leverage, through negotiating with our trading partners. And that's what the president did here with the drug trafficking tariffs, and what he's doing with respect to the reciprocal tariffs. I don't think the plaintiffs are challenging the reciprocal tariffs and whether they deal with... I know, but I was suggesting maybe they could. Maybe they could. But the reciprocal tariffs directly deal with the emergency of the trade deficit by imposing tariffs to reduce imports and directly address the trade deficit. So that's not... Can a trade deficit be an extraordinary, unusual threat when we've had trade deficits for decades? Well, the president identified a severe spike in the trading deficit over the last four years that has caused... Essentially, it's reached a tipping point. It's affecting our military readiness. It's affecting our domestic manufacturing capabilities. So yes, absolutely. But we can't look at that. We can't decide whether that makes sense or whether it's supported by the record or by the existence of what the president says is a national emergency. No, because 1701, delegates to the president have been discretionary choices, and the Supreme Court has been very clear in cases like Dalton v. Specter that, quote, how the president... How do you solve a non-delegation problem when there's no judicial vote? So I'm happy to address non-delegation doctrine. So even taking the intelligible principle test on its own terms, the Congress here in IEFA identified the general policy... What can we do as a court to cavern the president's authority under the statute if everything that he does is non-legitimate? You can check whether the president complied with Section 1702, which is what we've been discussing today, whether he acted within the scope of his delegated authority in imposing tariffs. When it comes to his... What does that mean? I don't understand. Whether the statute authorizes tariffs. The key statutory question... I can't say it does. It doesn't authorize any kind of tariffs we want. I think the court can review that question under the clear misconstruction standard, but when it comes to the president's rationale... In order to have an enforceable standard, we should limit the scope of his tariff authority? Well, there is an enforceable standard, Section 1702, and there are limits on that authority under the non-delegation doctrine. 1702B identifies four specific limits. The fact that those limits may not be satisfying doesn't give the court a reason to identify or come up with extra-textual limits on the president's tariff authority. Those are the limits in the statute. What are your four? Quick, round them off. 1701 has a number of limits. It has to be a national... What are they? National emergency. It has to be an extraordinary and unusual threat. It has to emanate from outside the United States. It has to deal with the national emergency. Those are the four limits in Section 1701. Why would the president utilize all the other trade relief statutes that are in the books right now? Section 338 of the Tariff Act, Section 232, which authorizes the imposition of additional duties, Section 122, Section 201, cases that have come before this court that authorizes the president's tariff authority to the duty of tariff rate quotas, Section 301 of the Trade Act of 74, Section 731 of the Tariff Act of 1930, Section 107 of the Trade Act, Section 505 of the Trade Act of 74. All of these are... I'm not sure you would agree with me on this, but all of these are trade relief statutes, correct? Correct. They're designed to ameliorate or to repair some sort of damage that's been done to the U.S. economy because of imports, correct? Correct. And all these statutes are directed to imports, and they have a beginning and an end. Some have very complicated, highly technical investigative regulations. Is that right? Correct. Why would the president ever rely on all of these trade statutes if he has under IEFA this unbounded power? Because IEFA has its own limits, right? And even just yesterday... It has to be a national emergency, right? It has to be an extraordinary and unusual threat, and IEFA is not going to be sufficient to address every trade situation. Did you get all your limits out? Were there any others? We covered the 1701 limits, we covered the 1702B limit, the four limits there. The same argument, I think, was made in Yoshida that, yes, there were other specific tariff authorities that President Nixon could have relied on, but the court said the president could... Those statutes have heaps of bounds. They impose safeguards on the president. How long an action can take, how far an investigation, proving material injury to a U.S. manufacturing site. All of those are now dislocated, if we adopt your argument. Your argument dislocates that entire U.S. trade relief framework that I just called out on. Not at all, Your Honor. Even just yesterday, the president signed a new 232 order with respect to copper. Do you see the difference between a non-conductive action and the type of procedures that are built into place, the safeguards that are built into place, allowing all parties to comment and enduring and looking at whether there's been a certain burden of proof that has been met? None of that is in IEPA. Why is IEPA a trade relief statute? Because in emergencies, Congress wanted to give the president extraordinary authority to protect the United States, national security and foreign policy, and all of those tariff statutes are... One last point here. Are you familiar with the GSP system, Generalized System of Preferences? I'm sorry, I'm not. Okay. That too is a trade relief statute, and it's a process whereby the United States recognizes less developing economies, and it allows less developing economies to maintain a higher tariff rate than what he imposed against them. And so only Congress can amend and renew that GSP system. Seems to me that this is another trade relief statute that IEPA would dislocate if we were to adopt your argument. Well, just to answer that point, Your Honor, all of those statutes remain valid and available to the president, but in its wisdom, Congress understood that in an emergency, the president may not have the time to go through all the procedures and have a rulemaking process and have an investigation to address an extraordinary threat to the United States. We're going to hear from Judge Cunningham. You can answer that, and then we want to turn to the appellees. Well, I think 1701 requires the threat to have a source outside the United States. It's not clear to me that a budget deficit would satisfy 1701. And then 1702A1B also requires that a foreign national have an interest in the property. So it just doesn't seem like IEPA would be available in that type of situation, Your Honor. Okay. We'll save the rest of your time for rebuttal, and let's hear from Mr. Cunningham. Thank you, Chief Judge Moore, and may it please the Court. You just heard an argument in response to Judges Hughes, Stark, and Dyke that our federal courts are powerless, that the president can do whatever he wants, whenever he wants, for as long as he wants, so long as he declares an emergency. That is as major a question as it gets, a breathtaking claim to power that no president has asserted in 200 years, and the consequences are staggering. I understand why you'd want to start there. But... That might not be the way I, for example, view my role in reviewing the four limits that Mr. Shumate mentioned. So could you address, if we perceive ourselves as having some ability to review deals with extraordinary and unusual threats, what standard ought we to use for that? And how detailed a review do you think I get to see? So we think they would still lose if there were some detailed review. Obviously, you heard him pushing away. You gave him chance after chance to say, hey, I need these limits to be enforceable. Answer my question. Yeah. So we think that if you started to review, as he said, you'd review the 1702 limits, including unusual and extraordinary threat, and if so, they would lose every day of the week. This is the antithesis. IEPA has a freestanding requirement of an unusual and extraordinary threat in the statute, and unusual, as our brief explains, is a dictionary definition. Just because the bottom line is, one way of thinking about it, I can't get your answer. So this has to do with the difference between a balance of trade in goods and a balance of payment, and different kinds of consequences that a simple difference in, a negative balance of trade in goods, more imports than exports, can cause. All by itself, as you say, a negative balance of trade in goods is neither bad nor good. Just is inconsequential until you specify the consequences. So we need to know what the consequences are. Some kinds of consequences might be monetary, and we start calling those balance of payments because there are other factors that go into the accounting category of balance of payments. The reciprocal tariff executive order doesn't mention balance of payments. I mean, that should be obviously one reason that 122 might not apply. That's not what I want to get to there. This executive order says there are five or six related consequences on a negative balance of trade in goods. I'm going to summarize them as severe deficiencies that are manufactured. And that's what would have to be unusual and extraordinary. As I read your arguments here and below, the only thing you said about why we have something usual and ordinary is that negative balance of trade, the negative balance of trade in goods, is decades and decades old. I don't see you having to say anything at all about the usualness or ordinariness of the manufacturing deficiencies that are in fact itemized in the EO. That's what I want to get to. Thank you. So first let me talk about Chief Judge Moore's question about the standard of review and then get to the specific question about balance of payments. Maybe the standard of review doesn't matter. I understand that, but I just want to be... For Chief Judge Moore, we do think that Congress imposed a freestanding requirement about unusual and extraordinary, unlike, for example, their argument about emergency declarations, which are things that are committed to the president. And so there may be discretion there, but this is a freestanding thing which there is no discretion to whatsoever. They cite no precedent that says they get discretion in that circumstance. Now on your question about balance of payments, Forget about the balance of payments. That goes to 122. I don't want to talk about 122 right now. You'll probably get there. I want to talk about the difference between a negative balance of trade in goods and the consequences that may or may not occur. This executive order itemizes five or six consequences, and I do not see that you have made a case that those consequences are anything but. I think we have. We've taken the president at his word in which he says, first, that the trade deficit is large and persistent, and then, second, the consequences of that trade deficit, he says, are the diminishing of the manufacturing base and the like. We're not asking you to second-guess the president here. We're just saying take that exactly as a given. That's exactly what trade deficits operate under the historical norm. He says, well, it's spiked. It's spiked by 40%. He says that's not inflation-adjusted. Things can build to a different course. It's like going bankrupt, gradually then suddenly. Suddenly, there are these deficiencies in manufacturing, and I don't see manufacturing capacity, and I don't see that you have made any case. I will say, since you agree that I'm in a procedural posture here, if we got to the point of thinking that it was wrong to grant you summary judgment, do you think that we would remand for you to be able to address for example any kind of issue I'm not talking about? I think we would, but I really don't think you need to get there whatsoever. That is, the president's executive order isolates the trade deficit and those consequences as persistent for half a century, and I do think section... The executive order says that those consequences are persistent. The trade deficit's been persistent, and I think the whole point of the requirement, Judge Stronto, is in circumstances in which Congress can't act, in which you have an emergency crisis, then of course the president has some broad leeway. That's what, as Judge Dyke was pointing to, Yoshida was about, but it was limited in all those ways. Here he's coming and saying, well, I can declare a slow boil kind of emergency or something like that. That isn't the point of what AIPA's about or the predecessor statute of TWA. More importantly, I think, and this goes to something that Judge Reyna was saying earlier, we're talking about a statute that doesn't mention tariffs whatsoever in it. No precedent. Before my colleagues get in, we've talked a lot about what regulation of importation means. We've talked about what it doesn't mean, i.e., arguably tariffs. What does it mean? What does it do? Yeah, so I think it permits quotas, like limiting on the number of goods, licensing requirements. Does it include licensing fees? Well, licensing fees, I think, are a more complicated thing. The one thing that I think it excludes for sure is tariffs because historically that is something that our founders committed to the Congress, and as Judge Reyna was pointing out, every single time Congress has given the president tariff authority, they've done so expressly with words. He says Section 122 doesn't use the words. Of course not. It says, quote, in the form of duties. He says Section 232 doesn't use those words. Of course not. It refers to duties specifically in the statute. OK, so then we'll get back to what it does. So you said fees, but not license fees. You said quotas. Yes. Wouldn't quotas come under prevent or prohibit? I mean, a lot of verbs in subsection 3. It would be a lesser thing. So you don't have to restrict all of them. And he said, well, the president's power to block paid is a greater power than the power to tariff. Absolutely not. And this is what Gibbons versus Ogden is all about. The whole idea is that tariffs and taxation are always tempting for kings and for presidents. And so that's why that power was located in Congress. And every single time Congress has departed and given that power to the president, they've done so clearly. What about Algonquin? Algonquin said adjust imports. Adjust imports, but then it says duties. And the Supreme Court said that includes taxation. Yeah, that's their best case. And boy, it's a terrible case for them. Maybe their best case is Yoshida. Well, on Algonquin itself, that's a case in which the statute itself said duties, unlike this one. And there's a legislative history that says we're all about giving the president such powers over tariffs. Nothing like that here whatsoever. His one reference in the legislative history to Yoshida has been at best and doesn't say anything about them approving the prior authority. Now, you said Yoshida is their best case. I think as Judge Dykes said, pointed out, if you want to live by the sword of Yoshida, you're going to die by the sword of Yoshida. Yoshida has very, very strong limits on the use of the tariff power, in particular at point 2. When you use the word limit, can you distinguish between limits that were in the proclamation that contributed to the upholding and anything in Yoshida? I'm not sure there is anything that says these limits are necessary to uphold them and in the absence of them, you would hold them different. Yes, so first let me start at 583, in which Yoshida said a court wasn't approving in advance any future surcharge of a different nature or sanctioning the exercise of an unlimited power which would strike a blow to our Constitution. And then there were three specific limits in the opinion. One, that Nixon put a ceiling on the tariffs at, quote, the rate prescribed by Congress that didn't supplant the entire tariff scheme of Congress. That's at 577 and 578. Second, that it was a temporary measure at 572 and 578, meaning they would, quote, end. And they said it was very important that Nixon announced those ex ante in advance, that it was a temporary measure. That's unlike here. And third, that the tariffs didn't apply to all imports, but only those goods already subject to the tariffs at pages 577 and 568. And so the court said, quote, far from attempting to tear down or supplant the entire tariff scheme of Congress, the president imposed a limited surcharge as a temporary measure calculated to help meet a particular emergency and not imposed to raise revenue. None of those statements in Yoshida had anything to do with interpreting the term regulate. And all of those statements were directed to the constitutionality of President Nixon's proclamation, which is a different question than the whole exercise of trying to understand what does regulate mean. Either way, if his argument is that they've ratified Yoshida, then they ratified all of those limits, whether you call them constitutional or not. That's what Congress had in mind. We think this whole thing is bogus. The idea that Congress ratified Yoshida, a one-panel decision of this court, that they had awareness of it in a statute in which they copied 76 words from the predecessor statute, TWAIA. I mean, one of the predicates of statutory ratification is that the statutory landscape hasn't changed. As Judge Rayner was saying, it changed massively in 1974 with the enactment of Section 122, which is a statute to deal specifically with this. That's what Yoshida even says at footnote 33. It says, Section 122 is the way to deal with large and serious trade deficits. So I think all of that says the other thing. It says that the government would lose. The other point to make here is that if the government is right, then they're going to run surely afoul of the major questions doctrine. Because of the very same arguments you heard my friend make on the other side, that you can smoosh into the words regulate importation, the power over tariffs, is exactly what the President has been saying and the Solicitor General time and again. I know you wanted to say that regulate doesn't include tariffs. And I think you have some pretty good point with that. But if we assume that the only way you get tariffs into regulate here is through Yoshida, and we assume that they have to abolish Yoshida, not just the definitional aspect, then do we need to even reach the broader question? Because I didn't hear any argument from the other side that the tariffs under either the co-tariffs or the criminal tariffs met what were the clearly expressed boundaries of Yoshida. Absolutely. I think you wouldn't have to reach them. You could reaffirm what the CIT did there. Absolutely. My point to you is if for whatever reason you didn't buy the idea that there are limits on Yoshida, that section 122 isn't the way to do that, then you'd reach that broader question. Does IEFA authorize the imposition of tariffs at all? And the real problem they face there is the major questions doctrine. Because in Biden versus Nebraska, the government set a statute that gave the President power to, quote, waive or modify any statutory or regulatory provision. They said, well, that obviously includes cancellation of student loans. The court said, no way. Quote, minor changes are okay, but you can't unilaterally define every aspect of federal student financial aid. Same thing with Alabama Realtors. The statute said, quote, the government can make and enforce regulations to prevent communicable disease. Of course you put a fit into there, the eviction moratorium. The meaning of regulate. Could you respond to the government's argument that we kind of know from context when regulate includes the power to tax and when it doesn't? Yeah, Judge Strickland, we are all about context. The context of no trade law in 200 plus years that has been interpreted to give the President this power, as Judge Lurie was saying, this statute has no friends. Second, the context of every statute that gives the President the power to tariff that expressly says so, that's Judge Reyna's point, the context of the Constitution itself, which is extinguishing. The only argument, if I understand it correctly, that say in the FDA Act where the FDA is given authority to regulate, if I understand the government, they're saying the FDA at that point in the statutory scheme can impose taxes because it can regulate, but something else about the context of the FDA Act reads out that. Yeah, if the U.S. Chamber of Commerce brief points out what in the world context are they talking about? Take, for example, the SEC. The statute that gives the Commission the power in 78K to, quote, regulate transactions on exchanges, just like IEFA, to regulate importation, regulate transactions on exchanges. If this argument's true, every single time you and I sell a stock, the SEC can tax it. So there's nothing in the textual language of the SEC Act that would read out that power? Nothing that they can point to, and there's nothing in IEFA, by the way, that suggests that the President would have the power to regulate tariffs or taxation. The best he's got is this legislative history. I mean, it's been commonly said that legislative history is looking out at a crowd to pick out your friends. Here, they can't even find any friends to wave back. I mean, it is the most minor reference imaginable, and it certainly doesn't meet what this Court has used as a threshold for the statutory ratification doctrine, which is a judicial consensus or something like that, or as the Court, Judge Jike's concurring opinion in Arellano v. McDonough said, which was a concentrated venue case, that, quote, we are dealing with the decision of a single circuit court which has not been reviewed by the Supreme Court, and in that opinion, you said the statutory ratification doctrine prerequisites were not met. More importantly, Judge Stark, if the government's argument's right, they've got to overcome the major questions doctrine. They are asserting a sweeping of power as one imaginable with, as Chief Judge Moore pointed out, no judicial limits. You know, if the government is going to have that power, then Congress has to give it to them clearly. I mean, this is not an elephant in a mouse hole. This is a galaxy in a key hole. The term regulate can sometimes include tariffs. There are at least two statutes, one involved in the Supreme Court decision in Hampton and then another in the Fairfax in 1930 where Congress conferred the power to regulate and then made clear that that included the power to impose tariffs. So regulation doesn't necessarily exclude tariffs. I gather your point is that there has to be something explicit in the statute that says regulate in this context means tariffs. Your Honor, I'm aware of any case, any decision that says the word regulate includes tariffs. There are two statutes that say you can regulate by imposing tariffs. But they actually specifically give the power to tariff in those two statutes. And so, you know, there are many cases that say that the power to tax includes the power to regulate, but there are no reverse cases that say the power to regulate includes the power to tax. And as Gibbons versus Bogdan points out, these are two fundamental… Hampton says that tariffs can have a dual purpose. They can be a tax, but they can also be designed to regulate. And that's the whole point of the Hampton case. So it can be that tariffs have a regulatory component to them, but if that's going to be the case, then you would expect Congress to make some reference to tariffs. And because this statute doesn't do that, they resort to the OSHEDA and say, oh, well, Congress legislated against the background of the OSHEDA. But as we've discussed and we've seen this out, if they're going to take one part of the OSHEDA, they have to take the other part as well. That's exactly right. That's all you need to do here is to say exactly what you said. I do think that a further argument for those members of the court who aren't interested in that line of thinking, there's two other points, which is the IEPA doesn't authorize the regulation of tariffs at all, or if it does, section 122 in this statute, which is what you were getting at earlier, section 122 is the way in which the government has to deal with this. This seems to me to be a question of the trade lexicon, the language that people in the trading community use. You never refer or I've never heard reference to a tariff being regulated, meaning that you impose a tariff. You use the word you impose a tariff, you assign a tariff, you do different things like that. But what you don't do is regulate. Regulate, to me, seems to be more about dealing with the procedural apparatus that surrounds the imposition of a tariff. But either way you look at it, it doesn't mean create a tariff. So imposing a tariff is much different than creating a tariff. A hundred percent. And of course, it doesn't ever engage with you on trade law, but absolutely you're a hundred percent right. There's a difference between regulation and imposition of the tariff in the first place, which is why no president, as you started out today's argument, no president has ever read AITA this way. Now for those of you who disagree and think that Section 122 is the issue, I want to go back to Judge Toronto's question about balance of payment. Just to be clear, so you agree that regulate tariff to me, for example, requires certificate of origin upon importation. But the word regulate tariff, of course, here the word regulate importation, I'm not sure. Require a license for the importation of certain hazardous goods. Sure, in those circumstances, those aren't tariffs, and the president isn't imposing them as such. Here, as this case comes to the court, it's common ground that this is a tariff. Judge Toronto asked about the words balance of payments before in Section 122. Notably, the government is not making the argument that balance of payments is different than trade deficits at the reply brief at page 2. I think they equate the two. The reply brief at page 13 to 14, they make the assertion. It's not elaborated, but they make the assertion. It's very unclear to me. I don't talk about it. Okay. I'm so sorry. They do not do this in their opening brief. They make broad assertions because they're asking broader, bigger game about how IEFA can overlap even their 122 fine. We are sometimes in the business of looking for a void, deciding bigger questions and looking at narrower, specific questions. It seems to be worth exploring whether, in fact, 14.257 is actually about balance of payments, because it seems to me there's some reason to think not. Yes. I do think page 2 takes back part of what they say page 13, and I suspect the reason is the government's out there, including cited in our brief, example after example of them saying, we have the 122 power. Don't worry about IEFA. I think they want to have this 122 power. Now, if you got into the question you're asking, I don't think that there's a difference between balance of payments and trade deficits. That is, the largest component of the balance of payments is the trade deficit problem. That's what the CIT says at pages 34 and 35 of its opinion. The Department of Commerce actually keeps track of this from 1922 on. They've had a ledger, and the first entry in that ledger is the exports of the debits, and that's the imports coming into the country. And then the first entry on the other side is the exports coming in, and it is the biggest component of it. Let me just complete the thought. Part of it is a linguistic point about balance of payments and balance of trade. Part of it is a more substantive point. If there's going to be a threat to the economy, you have to say what the concrete problem there is. 122 is all about, as the 1970 proclamation was all about, monetary problems, exchange rates, reserves. This executive order is not about that at all. It's about a different set of problems, never mind the label, namely manufacturing deficiencies. So 122 doesn't address that at all. So even if it's exclusive, and it's 15%, 150 days, for the problem it was addressing, why would it be exclusive for this time? So just to answer four responses. First, it doesn't make any sense to think currency is different. The trade deficits lead to currency depreciation, and so they're part of the same problem. Second, the legislative history of 122 says that Congress is worried about trade deficits, and the oil trade in particular, and the massive trade deficit from $7 billion to $70 billion. That's at the Senate Report, page 88. Third, section 122 has a separate provision to deal with the currency problems you're talking about. The balance of payments occurs in a totally separate provision, so I think it would be wrong to read section 122 as only about currency. And fourth, if for whatever reason you disagreed with me, remember the Trump executive order here refers to, quote, currency practices and their associated market distortions that boost exports to the United States. So even if you thought section 122 was about currency, that's what he's invoking here as the problem. We do think that the clear, that the unusual and extraordinary threat language isn't met here because the president has himself called exactly this problem persistent. Every year he says, for the last half century, something that's been that persistent is the opposite of what's unusual. I just want to ask about the major question, doctrine again, I'm sorry, about the clear congressional authority. Assuming we were to conclude that there was legislative ratification by Congress of Yoshida's interpretation of regulated importation because we don't need to presume or inquire into a presumption of whether they knew about Yoshida. It's quite clear that they did in the House Committee report. Then would the legislative ratification there be enough of a clear congressional authority? I don't think so. So the Supreme Court in Utility Air Group had a similar case in which the Solicitor General said those ratifications, statutory ratification and the like, and what the court said was, no, you still need a major, you still need clear express authorization when you are asserting such a sweeping power, one that no president has saw before in the particular statute. And so here we think it would overwhelm, the major questions doctrine would overwhelm any kind of statutory ratification argument as with the doctrine of constitutional avoidance because as the learning resources case pointed out, if you adopt their view of regulation, then Congress has adopted a statute which is unconstitutional on its face, that it would permit the president to regulate export taxes, and that is something that is obviously unconstitutional. So their interpretation gives the very same word regulate two different meanings in the same phrase of the very same statute. So that's another reason why I think this ratification doctrine, not just that the prerequisites not met, but that their statutory interpretation is incorrect. We're going to hear from the states now. Thank you. May it please the court. I'm Oregon Solicitor General Benjamin Gutman. Defendants can't maintain that Congress intended to codify Yoshida into IEPA and then ignore the parts of Yoshida that directly refute their arguments. So I'd like to start by talking about why, assuming that Yoshida is the governing standard for IEPA, both the reciprocal and the trafficking tariffs exceed what IEPA allows. And then, if time permitting, circle back to maybe why IEPA doesn't allow tariffs at all. So starting with the reciprocal tariffs, the key question is how IEPA and Section 122 fit together. And the answer is that the specific governs the general. Section 122 gives authority for tariffs to deal with large and serious balance of payments deficits, but it puts limits on those tariffs. And IEPA's general authority to regulate importation doesn't allow the president to defy Section 122's specific limits. That's exactly what IEPA said. Let's start with you. Congress could have had in mind that the president has more authority in unusual... You said 122 deals with long and serious. Large and serious.  And the National Emergency Act and IEPA deal with unusual and extraordinary circumstances. You don't think that Congress could have contained that the president ought to have more authority in IEPA in unusual circumstances rather than just when they're long and serious? Large and serious? If a large and serious trade deficit is an emergency, it's an emergency that Section 122 directly addresses and covers and sets limits for. I think the federal government is misreading the part of IEPA... Sorry, the part of Yoshida on page 578. That discusses emergency and non-emergency powers. What it's talking about... I mean, it uses the term foreseeable and non-foreseeable issues. That Congress has enacted specific authorities to deal with foreseeable issues and left, in that case, TWA to deal with issues that were not foreseeable. Section 122 shows that not only is this a foreseeable issue, but it's one that Congress has specifically foreseen, thought about how much authority to delegate to the president, put limits on that, and so the idea that a general conferral of authority would... Something could be large and serious and not rise to the level of extraordinary, unusual, and unforeseeable. Correct. But if it is large and serious, whenever... Section 122 says whenever there's a large and serious balance of payments deficit, and then it sets forth the power. Couldn't Congress have attributed greater powers when there's an emergency and it's unforeseen? Couldn't they have envisioned that the president would be greater powers in those circumstances than when it's just large and serious? Sure, they could have, but if you look at these two statutes together, there is no indication that that's what Congress was doing. Congress was providing authority for the president to deal with any large and serious trade deficit in Section 122, and it was providing... Isn't there a distinction between the trade deficit and the consequences of the trade deficit? And that being... For instance, we know we've had a trade deficit forever. But what if, all of a sudden, an entire industry of integral national security collapses overnight? That has been going a long time, but the version of the event is, for instance, let's just say there's a certain shift that all of our military computers and funding that they need are distributed to the collapses when it goes overseas. What if you use IEFA to solve that problem? You might be able to, although I should point out there are other tariff statutes that might cover exactly that. If it's a military issue, Section 201, if it's hurting domestic industry. So we'd have to examine exactly what that is. But the point is, I think in your hypothetical, we're not talking about tariffs that are justified as a response to persistent trade deficits. That's exactly what the president invoked here. And so, yes, maybe there are other things that the president could have done and other reasons the president could have given, and we could examine those. But when the president is imposing tariffs to address a large and serious trade deficit, that's exactly what Section 122 is addressing. Judge Taranto, you were asking about the record on summary judgment, about manufacturing in particular. Did you consider whether the parties agreed that the resolution of this motion, the motion that only came from your side, your actual, your attribution, that there was no government motion for summary judgment?  Everybody agreed that this was a complete record on which this case was going to be decided in favor of one or the other. Correct? That's correct. Reversing a ruling, a summary judgment for the plaintiff doesn't do that by itself. And the record on summary judgment includes, you can see this appendix, pages 215 to 219, undisputed evidence that the state submitted that the government did not submit any evidence contradicting this, specifically addressing manufacturing. So if Your Honor is interested in what the evidence was on manufacturing issues... I'm sorry, I'm just asking a procedural question. We have a grant of a motion for summary judgment in favor of the plaintiff. Correct. If we reverse that, without saying anything else, it's an open question whether the government is entitled to judgment in its favor. Ordinarily, it wouldn't be without just because... If you reversed on the ground that there were genuine issues of material fact, then yes, I suppose further proceedings would be required. But the evidence in this case was undisputed. We submitted a fair bit of evidence, including expert evidence, and the government didn't rebut any of it. So taking that evidence, even in the light most favorable to the government... But your arguments and your briefs, Your Honor, are devoted to just the more narrow question of trade deficits alone as not amounting to an unusual and extraordinary threat. Correct. You didn't comment at all about all the other things the executive order identified, including the hollowing out of the manufacturing base, the threat to national security, supply chain disruptions, everything else that it talks about. And that's because, I mean, you can look at the executive order itself. The justification, the unusual and extraordinary threat that it is identifying is what it calls persistent trade deficits. Everything else that's discussed there is either mentioned as a cause or an effect. But it's the trade deficits that are what the president was claiming as the justification for the action. Is that the only fair reading of the executive orders, though? Can it be read as there are some recent consequences, some recent effects of the long and persistent trade deficit? That now are unusual and extraordinary, and that's what the president's acting on. Why would that, in your view, not be a fair reading? Well, I think, I mean, you can look at the title itself. I mean, there are, those causes and effects are mentioned in about a sentence in the executive order. But the, you know, the entire weight of what the executive order is discussing from the title down is the trade deficits. What happens when you add traded services to the equation? In this whole thing we've been talking about trading goods, there's been an exclusion of traded services. There's still a deficit. The balance of trade is the largest component of what would be the current account, which would include the services and other transfers like that. There is still and has been historically a significant deficit. So, but that's... Counsel, you said that you thought that the effects were mentioned in about a sentence. I don't know if you and I are reading a totally different executive order. Are you reading 15041, the Federal Register site, 15, Executive Order 14257? Because it goes on for paragraph after paragraph. I see one that talks about U.S. production, one that talks about military equipment, one that talks about how U.S. security is compromised by foreign producers of goods, one that talks about how the decline of U.S. manufacturing capacity threatens the U.S. economy in other ways, including the loss of manufacturing jobs. How does that not constitute what the president is expressly saying is an extraordinary threat? He uses the word threat for goodness sakes. How can you say, how could you stand here and say to me that the president said it's all about the deficit and it's one throwaway sentence at most in this whole order about the rest of these things constituting the threat? The executive order is clear. So I am looking at section one of that executive order where the president actually declares the emergency and it's the emergency arising from conditions reflected in large and persistent annual U.S. trade good deficits. And I believe that that's the operative language. That is what is determining what is, because under AIPA it's very important to know what exactly is the threat that the president is addressing because AIPA says that the president can. Okay, well how about we go to section one where he actually declares the national emergency which is on page 15044 of the Federal Register. I've declared a national emergency arising from the conditions reflected in the large and persistent trade deficit. But he goes on to say, this deficit reflects asymmetries in trade that have contributed to the atrophy of domestic production capacity, especially in the U.S. manufacturing and defense industrial bases. These asymmetries, I mean, wouldn't I actually look at the sections which is where he says, for these reasons I hereby declare an order? Wouldn't that seem like a relevant part as opposed to sentence number one which just is in the background? Wouldn't you actually go to, for these reasons I declare an order? Wouldn't that seem relevant? And doesn't he clearly articulate where he declares and orders all of these things in exasperated detail? Compromised military readiness. That bothers me. I'm a little concerned about compromised military readiness. How about you? We all should be. We all should be concerned about that. What he's saying is the unusual and extraordinary threat. How would you say a single sentence in the beginning? If you may be overstated, do you want to walk it back? Of course, this is what I invite people to do on occasion. Sure, I will walk back that it was a single sentence. But I think if you read this, the fairest reading of this executive order is that it is about the large and persistent trade deficits. And I should say, the federal government, I don't think, argued to the contrary in the Court of International Trade. So if that's their argument here, the argument's not preserved. Well, when they say large and persistent, it's followed by, which have grown by over 40% in the past five years alone. There's also a reference to the fact that when President Trump left office, there was a trade surplus in agricultural products. But today that surplus has vanished. And now there's just a projected $49 billion annual agricultural trade deficit. That's all included in the executive order, right? And that is the kind of situation that Section 122 provides authority for the President to address. And again, if you don't agree with that argument, you don't have to agree with that argument in order to rule that the reciprocal tariffs are unlawful, either because they exceed what regulate means in this context, or because IEFA just doesn't allow tariffs. Can I ask you what I asked Mr. Katyal?  What would regulate importation does in the statute if it doesn't cover tariffs? Well, there are a lot of other ways that you can regulate importation. I mean, it would depend on the nature of the threat. But if you imagine, maybe, as opposed to an ad valorem tax, maybe, although I think that would be tricky. But I think what it clearly would cover, for example, would be, suppose there's an agricultural pest that's been identified that's coming into this country through imports and is threatening our agriculture. The President could regulate import... It could cover under different portions, because it includes regulate, an alternative verb is prevent or prohibit any importation. So that could be covered by the other... If the President wanted to prevent or prohibit, but if what the President wanted to do was require additional inspections or irradiations or quarantines, those are all things that I think would most naturally fit into regulate. And again... Suppose a fee protection would cover additional inspections? I think that would be hard. I think that would be a harder case for us. And I think that if it wasn't an ad valorem, but if it was a fee that was tied to the actual cost of providing that service. I still think when you're talking about a statute that is authorizing the federal government to raise revenue, we normally would require something clearly authorizing that. But the statute does talk about licensing. It might be, and what I can say is that if the fee that the President was imposing for that was something that, like these, affects trillions of dollars in trade and fundamentally remakes the economy, then we would still have a major questions doctrine question about can you really stretch regulate that far? But if it was a small fee that was proportioned to the actual cost of providing the service, that might be permissible. That's not what we have here. If the President believed there was some kind of public health emergency and needed to shut down all the borders, would IEBA authorize the President to block all foreign imports for a period of time? Potentially, if that would deal with the threat, I think I would need to know a little bit more about exactly what the threat was. So that's a much more dramatic order than the kind of order we have here. Well, it's an order of a very different kind. Raising revenue is fundamentally different from regulating commerce in the way that Your Honor is describing. And I think it's important not to conflate those. Those are two different powers under the Constitution. Going back to Gibbons versus Ogden, the Supreme Court has recognized that they're different. And they're different because the power to raise revenue is a power that's reserved to Congress. It was a power that was of particular concern to our founders. That's not the entire purpose of tariffs. I mean, you gotta read the Hampton case where exactly that issue was before the court. And the court said, yes, you can have tariffs to raise revenues, but you can also have tariffs to address other problems. Absolutely, absolutely. But I think my point is that actions that raise revenue, whether or not they're accomplishing something else, are in our constitutional structure fundamentally separate from actions that regulate in other ways. And that's really the only point that we're making is that if you have a statute that governs one, you would be looking for something in the context of the statute to suggest that Congress meant both. Can I focus you on the trafficking tariffs? Yes. Because you're challenging those, right? Yes. If I were to agree with the Port of International Trade that regulate allows some tax tariffing, but I didn't agree with it that there's a problem with the deals with limitation, would I have to reverse the CIT, the trafficking tariffs on their validity, or do you have some other argument as to why they would nonetheless be invalid if I don't buy the deals with issue? If you don't buy the deals with argument and you don't buy the argument that it doesn't allow tariffs at all, I think, was that also the premise of the question? Yes. Then I think we still have an argument, I think, along the lines of some of Judge Hughes's questions, that the term regulate still only connotes modest modifications. I mean, the federal government's favorite synonym for regulate is just, and they want to... Then what would make the trafficking tariffs, in your view, not modest or not merely an adjustment? Because they're not, for example, like the tariffs at issue in Yoshida that were strictly bounded by the column 2 amounts that Congress had previously... Something about the rate? Yes. And the duration. And the rates and the duration and the scope. I mean, adjust the plain... We cite this on page 17 of our brief, Webster's Dictionary Definitions, that explain that adjust has a connotation of modest modifications that bring something into harmony. This is a lot like Biden versus Nebraska, as Mr. Katyal was explaining. A statute that said that the president could waive or modify any statutory provision didn't mean that the president could cancel student loans because that's too big an action. I think you could make the same argument here and reach the same result here, even if you didn't accept either of those other arguments. Well, what if we conclude we're living in a Yoshida world and, in fact, there was some form of legislative ratification here that this language, regulated importation, includes what Yoshida said in its interpretation of that language as permitting authorizing tariffs. And we look at Yoshida and it said, at the very end of the opinion, that this is an incredibly broad statutory authorization that Congress has given the president. It may be unwise and it may be very dangerous if it gets into the wrong hands, but this is Congress's choice. And so I guess the concern I have here is your attempt to narrow and characterize Yoshida as only some lightweight version of imposing tariffs and surcharges as opposed to understanding the term regulated importation as just including the power to apply tariffs, period. Well, I think Yoshida is much more helpful to us than it is to the federal government in this case. Well, I know you think that, but you just hear what I said. Yes, exactly. And what Yoshida says repeatedly is that it is not sanctioning an unbounded exercise of tariff and authority. And whether it does that because of the constitutional concerns or just because of reading the statute, the net result is exactly the same thing, which is that Yoshida's interpretation of TWA doesn't allow the breadth of authority that would be required to sustain the tariffs here. And if Congress intended to ratify that, then there's every reason to think that Congress intended to ratify all of that. So then how would you say in a sentence what it ratified? On the assumption that Congress ratified Yoshida, it ratified the holding that before Section 122 was enacted, TWA allowed the president to impose modest bounded temporary tariffs that were within the statutory framework that existed but did not sanction unbounded permanent tariffs that were outside of that. Is the key, the language that you said, that it has to be within the schedule that Congress has enacted? I think that might be part of it. I mean, you know, there are sentences you can pull out from Yoshida that I think point in different ways. But that was certainly one of the factors that I think caused the court in Yoshida to think that the surcharge at issue in that case was permissible. Do you understand enough about how COD 2 worked in 1971 and works today to provide some clarification of exactly what we should think about the language that the 10% surcharge, if it went over a column 2 rate, was by the terms of the 1971 proclamation limited to the column 2 rate, which at least today applies to what, four countries in the world? Right. And in 1971, I think not only to maybe eight, but the same treatment was maybe accorded to about a dozen other countries in the interpretive note. Yeah, I don't know how many. I don't understand how this column, what to make of this column 2 thing, which are rates that are, I think, set just for certain countries. So it's not like for a country that's not on the list that there is a column 2 rate specified by Congress. So my understanding is that column 2 is for countries for which we did not have normal trade relations. And so it was sort of the residual of, these are the tariffs that would apply to the whole world, except that we have normal trade relations with most of the world. And so we have agreed to reduce those tariffs. So I think what Yoshida saw is the significance in column 2. Are all of the column 2 rates higher than all of the non-column 2 rates? I don't know the answer to that. I think they're typically. I think there's kind of a necessary assumption, some idea that a set of rates that applies to a tiny number of countries reflects a judgment that for the rest of the world, that's as high as Congress is willing to go. Is that true in 1971? Is it true today? I think it is still typically true. I can't say that I can. How do column 2 rates come into existence and by who?  How do column 2 rates come into existence and by who? By the same way that any other tariff. That's not a good idea. OK. So I think they have typically historically been enacted by Congress. Congress has, of course, sometimes delegated authority to the president to make adjustments or to other executive officials to make adjustments to the tariff schedule. I don't know if that is specific to column 2 or if there are specific delegations about column 2. But historically, these were either enacted by Congress originally or they were enacted by Congress in ratifying trade deals. I think ratifying trade deals is probably not going to affect column 2 either. So I think you'd probably have to go back a ways to find the origins of the column 2 rates. I can't say that I know that every single one of them is lower than, is higher than the column 1 rate. But I think that would, and logically, that would make some sense. They're not. Coffee is zero for everybody. It has been since 1970. Congress likes its coffee. So they want to be able to get imported coffee and have zero tax. So column 1 or column 2, coffee is zero. And there are certainly many lines in the harmonized tariff schedule where column 1 and column 2 are the same. And it's either because it's all free or because it's all very low or it's all very specific. But there are still column 2 rates that are four cents per kilogram of beef and things like that that really don't, I think, reflect how most of our modern tariffs work. Okay, thank you, Mr. Gutmann. Thank you. Give the government all 10 minutes of its rebuttal time because we went over with both of the appellees. Thank you. Judge Chen, you brought up the end of the Yoshida opinion, and I think that's a fitting place to end the argument today because I think, excuse me, at the end of... So we're going to just leave a minute? We're ending the argument. Give me 10 more minutes. I think the end of the opinion informs how a future court should review a future president's use of emergency authorities to impose tariffs. And the court said at page 583, when Congress uses far-reaching words in delegating authority to the president, in the area of foreign relations, courts must assume, unless there is a specific contrary showing elsewhere in the statute or in the legislative history, that the legislators contemplate that the president may and will make full use of that power in any manner not inconsistent with the provisions or purposes of the act, end quote. And so that's the point I was trying to make earlier is that Congress didn't... The Yoshida court didn't intend to confine, or Congress didn't intend to confine the president's use of IEPA to exactly the same facts as Yoshida. Instead, in the context of an emergency statute, Congress intends for those statutes to be interpreted very broadly, and the court has to look to specific limits in the statute itself. Is that really how we interpret statutes anymore? I mean, don't we just start with the test to regulate and go from there? It seems like you're having to start somewhere else. Well, to start your opinion on solar energy, I think properly framed the question under the clear misconception standard, and that's the standard that applies here, and that standard is well-rooted in the Supreme Court's precedence, recognizing that in the foreign affairs and national security context, courts give broad deference to the president and interpret statutes broadly because the intention is that Congress understands we need to give the president broad discretion in the national security context. Do you think that standard survives low-grade? Absolutely, and I think Justice Kavanaugh explained why in his consumer's research concurring opinion. He explained, look, the major questions doctrine applies in the domestic context, but it doesn't apply in the foreign relations context because going back to Curtis Wright, Marshall Field, Jameson Ward, the Supreme Court has always given the president a wide berth, a broad depth. I'm starting to disagree with that, right? Not in the context of specific delegations to the president in the national security context. Could I understand exactly what's going on here? I have some familiarity with Harmonized Tariff Schedule, and I decided to go look at that, and if I understand the executive order, what it does is to virtually every rate set by the Harmonized Tariff Schedule now under reciprocal tariffs, there will be 10% added to that. So it's a wholesale revision of the scheme that Congress enacted in the Harmonized Tariff Schedule, correct? There is a modification, yes, of the Harmonized Tariff Schedule. But it's just hard for me to see that Congress intended to give the president in AIPA the wholesale authority to throw out the tariff schedule that Congress has adopted after years of careful work and revise every one of these tariff rates. It's really kind of asking for an extraordinary change to the whole approach of tariffs reflected in the Harmonized Tariff Schedule, right? I disagree, Your Honor, because this is a broad statute that delegates the president broad authority. I didn't ask whether the statute is a broad statute. I said the effect of it is a broad revision, really tossing out the Harmonized Tariff Schedule and substituting a new schedule with rates set by the president. That's what's going on here, right? That's what's going on in the context of an emergency, and if Congress disagrees with that action, of course, Congress can step in and check the president. And I think the question for the court is whether what the president did contravened any specific limit in the statute itself, in AIPA, the statute he invoked, and that's what Yeshida says at the end of the opinion the court should focus on. Not only do you start from the presumption that Congress intended to delegate broad authority, but you look to the act itself. Did the president violate any specific limitation in AIPA itself? When we talked about those limits today, they have not carried their burden to show that the president violated a specific limitation in the statute itself. I know it may be hard to believe that the president may have this power. Counsel, wouldn't maybe your argument possibly be that Nixon also adopted a 10% tariff in Yeshida on absolutely everything and against every country? Now, mind you, he bounded it for every single category to the column 2 rate, but to the extent that somebody is saying wholesale, wasn't Nixon's proclamation equally wholesale in terms of the number of countries it impacted and the number of goods it impacted? Yes, it was an extraordinary invocation of tariff authority as well under an emergency statute. It was temporary, right? And it was temporary, and presumptively... But it also only applied in the situations where the president had increased the rates and he was now decreasing, right? Well, I don't think... No, I don't think it's right to think of Yeshida as only affirming and allowing future presidents... No, that's not the question. The question is what did Nixon do? That's what Nixon did, right? I mean, he said when the president exercised the authority to increase the rates, he exercised the authority to decrease it, right? Right, he was taking a specific action. The fact that the president's action in this case may be broader than President Nixon's action doesn't make this action illegal unless the plaintiffs can point to any specific violation of the statute, and they haven't here. The statute has specific limits. The plaintiffs haven't carried their burden to show that the president violated or exceeded those limits. We come back to the text of the statute. Again, IEFA is an extraordinary delegation of power, and the delegation here is to regulate importation. Can I just change you to the constitutional question? I have some trouble with the idea that the courts and public can see the boundaries component of a recently reiterated standard for a constitutional delegation and how that can apply if the substantive standards of the delegation are not enforceable in some way. There's reason to think that merely procedural standards don't count. That's a Rock something case that says that Mary Poppins is passing, but it doesn't say that. So I'm looking just at the substantive standards, the unusual and extraordinary characters that for this purpose and no other deal with. So I address that. I guess put aside, I guess that's a question. I guess that seems to me a big problem with your broad contention that those substantive standards are not judicially reviewable. And I'm interested in if they are reviewable, what does the case law really say about which particular presidential judgments should be different as opposed to everything the president says should be different, which I don't think the case law says. To take the latter question first, the case law says that the president's discretionary decisions are not reviewable, and that comes from a case called Dalton v. Specter. You can't tell what's discretionary until you've figured out what the meaning of the particular statutory standard is and what the facts are, and it's what the bounds of the discretion are. Well, I think the discretionary decisions here are set forth in Section 1701, declaring a national emergency, identifying a threat. But put aside the declaration of emergency, I don't know if that struck you, the unremovability of that, but the unusual and extraordinary character. The other side clearly thinks that has some context because they say, we've proven that this is unusual and extraordinary. They can't say that if it's completely meaningless. So that intelligible, why is it that, why can't that be reviewable? The president asserted a fact that was actually disprovable as opposed to a prediction or a valid judgment or a policy assessment about how to evaluate things. But an actual provable or disprovable fact, why would that not be legitimately reviewed under the differential approach of foreign affairs? So I think the court addressed this in Florsheim at 796. The court said his motives, his reasoning, his findings of fact requiring the action and his judgment are immune from judicial scrutiny. That decision is consistent with a long line of cases saying that presidential discretionary decisions are not reviewable. But what you can review are whether the president contravened any limits on his authority in section 1702. Did he regulate importation? Did he contravene any of the four specific limits in 1702B? So there is a role for the court to play, but the primary role is for Congress to check the president if there's an abuse of the IEPA tariff authority. And what aspect of constitutional non-competition law says that what you think remains of judicial review is sufficient to check the president or the court of delegacy whether that person is stating the intended characteristics which is to say it's repeated several times in communication with consumers research drawn from earlier. So I think Justice Kavanaugh in consumers research and Curtis Wright recognize a lesser standard for the non-delegation doctrine in the foreign affairs context. But even under the non-delegation doctrine intelligible principle test, you've got two problems, right? One, did Congress identify the general... I see my time is up. Congress identify the general policy which they have in section 1701. And then the second question is what are the boundaries? Did Congress identify limits on that authority? 1702B provides the limits on that authority and the court can check that. We'll do that. Okay, I thank all counsel. This case is taken under submission. All rise. The audience report is adjourned for today.